**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21 Cr. 411 (APM)** |
| **v.** | : | |
| | : | |
| **MATTHEW BAGGOTT,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Matthew Baggott to a term of incarceration in the middle of the guideline range as calculated by the United States Probation Department, followed by one year of supervised release, 60 hours of community service, and $500 in restitution.

**I.      Introduction**

Defendant Matthew Baggott, a 29-year old owner and operator of a wildlife removal company, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on April 5, 2022, (ECF No. 50 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Baggott pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, a first degree misdemeanor. As explained herein, a sentence of incarceration is appropriate because Baggott both observed the crowd's aggression towards police officers prior to his entry into the Capitol building, entered the Capitol building as part of the first wave of rioters to breach through the Senate Wing Doors and himself engaged in violent behavior by throwing an object at the officers, remained in the Capitol building for more than 40 minutes during which time he traveled far and wide throughout the building, and grabbed at a police officer's baton as he was being expelled from the building.

The Court must also consider that Baggott's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances of Baggott's crime support a sentence in the middle of the Guidelines range in this case.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 50 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Baggott's conduct and behavior on January 6.

### *Matthew Baggott's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Matthew Baggott and his friend and co-defendant, Stewart Parks, traveled to Washington, D.C. from their homes in Tennessee in order to attend the "Stop the Steal" rally. PSR ¶ 22. Shortly after 2:00 p.m., Baggott and Parks were positioned on the Northwest stairs of the Capitol, which lead from the West Plaza of the Capitol to the Upper West Terrace, underneath scaffolding erected for the upcoming Presidential inauguration. Baggott was wearing a red "Trump" sweatshirt, a dark blue baseball cap, and a black string backpack. The landing at the middle of the stairs was guarded by a line of United States Capitol Police ("USCP") officers behind a metal barricade. Close to Baggott and Parks, rioters were attempting to pull the barricade away, sprayed chemical irritants at the police, jabbed flagpoles at them, and yelled phrases such as "Death to Tyrants!" and "Push!" *See, e.g.,* Exhibit 1[2] at 01:06-01:17, 01:40-01:55, 03:10-03:35, 04:23-50:25. In addition, some rioters were armed with USCP riot shields. Baggott, Parks, and others also appear to have been attempting to create an opening in

---

[2] Exhibit 1 is an excerpt from a 1 hour, 26 minute, 15 second video posted to YouTube with the title "Full Video The Seige On United States Capitol," available at https://www.youtube.com/watch?v=Dg4HAVjykXE.

the white tarp that covered the scaffolding.  Exhibits 1A-D depict Baggott (circled in yellow) on

the Northwest stairs:



*Exhibit 1A*
*(Exhibit 1 at 00:57)*



*Exhibit 1B*
*(Exhibit 1 at 02:15)*



*Exhibit 1C*
*(Exhibit 1 at 05:27)*



*Exhibit 1D*
*(Exhibit 1 at 05:54)*

Parks filmed Baggott in this same location and captured Baggott throwing a small object

at the USCP officers at the top of the Northwest stairs.  *See* Exhibit 2:[3]

---

[3] Exhibit 2 is a except from a video recording of "stories" from Parks's Instagram account, taken by a tipster who sent the recording to the FBI.  "Stories" are pictures or short videos that are viewable for only 24-hours.  The story prior to the one depicted in Exhibits 2A-C is also of the Northwest stairs and is captioned "WE'RE GETTING IN."



| *Exhibit 2A* | *Exhibit 2B* | *Exhibit 2C* |

*See also* PSR ¶ 11.

Several minutes later, rioters breached the police line, overpowering the officers, and swarmed up the stairs towards the Upper West Terrace of the Capitol building.  *See* Exhibit 1 at 10:12-11:01.  Baggott and Parks joined the crowd and climbed the rest of the stairs, only about 30 seconds behind the initial breachers, with Baggott pumping his fist in the air:



*Exhibit 3A*
*(Exhibit 3 [4] at 00:34)*

Baggott and Parks ran towards the Senate Wing doors, where other rioters were breaking through the adjacent windows and kicking at the doors. Baggot and Parks were present for the breaking of the windows that led to the initial breach:

---

[4] Exhibit 3 is USCP CCV footage of the Northwest stairs.



*Exhibit 4A*
*(Exhibit 4⁵ at 00:09)*



*Exhibit 4A (zoomed)*

---

[5] Exhibit 4 is a video taken from an upper floor of the west side of the Capitol building, viewing the area outside of the Senate Wing doors.



*Exhibit 5A*
*(Exhibit 5[6] at 00:30)*

At 2:13 p.m., one rioter opened the Senate Wing doors by kicking them from the inside, allowing other rioters, including Baggott, to enter.  This group of rioters was the first wave to enter the Capitol building at this particular breach point.  PSR ¶ 23.

---

[6] Exhibit 5 is an excerpt from USCP CCV footage.



*Exhibit 6A*
*(Exhibit 6[7] at 01:34)*

---

[7] Exhibit 6 is a 1 minute, 35 second video posted to YouTube with the title "Trump Supporters Storm U.S. Capitol in DC," available at https://www.youtube.com/watch?v=aUjtmt_9GcY.



*Exhibit 5B*
*(Exhibit 5 at 01:40)*

Baggott entered less than 40 seconds after the first rioter climbed through the window south of the door.

From there, Baggott and Parks proceeded up a set of stairs – following a crowd that had chased USCP Officer Eugene Goodman from the first floor of the Capitol to the second floor less than a minute earlier – and into the Ohio Clock Corridor, which was guarded by a line of USCP officers.



*Exhibit 7A*
*(Exhibit 7[8] at 00:21)*

---

[8] Exhibit 7 is a video taken by an individual on the East Senate Grand Staircase, looking down onto the stairwell below.



*Exhibit 8 [9]*

Notably, the main entrance to the Senate was just behind the line of USCP officers.  Baggott and Parks stayed in the Ohio Clock Corridor for approximately seven minutes, from 2:16 p.m. to just before 2:22 p.m., leaving after another rioter deployed a fire extinguisher.

Baggott and Parks then went back to the first floor, crossing back through the area near the Senate Wing doors, where rioters were continuing to stream in through the windows and door.

---

[9] Exhibit 8 is a still image from USCP CCV footage of the Ohio Clock Corridor.



*Exhibit 9* [10]

For approximately the next half hour, Baggott and Parks walked through and/or remained in several areas of the Capitol building, including the Crypt, the Rotunda, and Statuary Hall. PSR ¶ 9.  By 2:54 p.m., Baggott and Parks were in a corridor to the east of the House Chamber. Officers with the Metropolitan Police Department ("MPD") were attempting to clear rioters from the Capitol building.  Several rioters resisted, leaning their body weight into Officer B.R., who responded by using his baton to push them towards the exit.  As shown in Exhibits 10A and 11A below, Baggott was positioned near one such rioter and grabbed Officer B.R.'s baton, but did not take it.  PSR ¶ 10.

---

[10] Exhibit 9 is a still image from USCP CCV footage of the area inside the Senate Wing doors.



*Exhibit 10A[11]*
*(Exhibit 10 at 00:06)*

---

[11] Exhibit 10 is an excerpt from USCP CCV footage of the area just inside the south entrance/exit on the second floor of the east side of the Capitol building.



*Exhibit 11A[12]*
*(Exhibit 11 at 00:10)*

In total, Baggot spent more 40 minutes inside of the Capitol building.  Baggott has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so, and they engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.  PSR ¶ 12

*The Charges and Plea Agreement*

On May 24, 2021, the United States charged Baggott by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2), and 40 U.S.C. § 5104(e)(2)(D), (E), and (G). On May 30, 2021, law enforcement officers arrested him in Tennessee. On June 21, 2021, the United States charged Baggott by a five-count Information with violating 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2), and 40 U.S.C. § 5104(e)(2)(D) and (G).[13]   On April 5, 2022, pursuant to a plea

---

[12] Exhibit 11 is an excerpt from Officer B.R.'s body-worn camera footage.

[13] Count Five pertains only to Stewart Parks.

agreement, Baggott pleaded guilty to Count Two of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(2). By plea agreement, Defendant agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

Baggott now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(2).  As noted by the plea agreement and the U.S. Probation Office, Baggott faces up to 12 months of imprisonment and a fine of up to $100,000. Baggott must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Sentencing Guidelines calculation set forth in the PSR is the same as the calculation to which the parties stipulated in the plea agreement.[14]   According to the PSR and the parties, Baggott's adjusted offense level under the Sentencing Guidelines as follows:

---

[14] The government notes, however, that the Probation Office's sentencing recommendation is based, in part, on the inaccurate statement that "[t]here is no evidence suggesting Mr. Baggott was . . . . within the crowd that unlawfully entered the US Capitol on [January 6, 2021.]" Sentencing

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4(a)) | 10 |
| Physical Contact (U.S.S.G. § 2A2.4(b)(1)(A)) | +3 |
| Acceptance of Responsibility (U.S.S.G. §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 11 |

*See* PSR at ¶¶ 33-42; Plea Agreement, ECF 49, ¶ 5(A).

The U.S. Probation Office calculated Baggott's criminal history as a zero (e.g. category I). PSR at ¶ 45. The government does not contest that finding. Accordingly, the U.S. Probation Office calculated Baggott's total adjusted offense level, following a two-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), as 11, and his corresponding Guidelines imprisonment range as 8-12 months. PSR at ¶82.[15]

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *United States v. Rita*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

---

Recommendation, ECF No. 60.  In fact, the defendant was in the first wave of rioters to enter the Capitol building via the Senate Wing Doors and stayed in the building for more than 40 minutes. *See* PSR ¶¶ 23, 24, 26, 28.

[15] The calculation above results in a Guidelines range of 8-14 months' imprisonment.  However, because the statutory maximum sentence is 12 months' imprisonment, the Guidelines range is adjusted to 8-12 months imprisonment.  U.S.S.G. § 5G1.1(c)(1); PSR ¶ 82.

*Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. <u>See</u> 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence in the middle of the Guidelines range.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob – as Baggott in fact did. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air – as Baggott must have. No rioter was a mere tourist that day.

20

Additionally, while assessing Baggott's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

As Baggott approached the Capitol building, it was clear that the crowd was geared up for violence.  In the several minutes that he and Parks were under the scaffolding on the Northwest stairs, the crowd -- of which they were a part -- taunted officers, sprayed substances at them, and attempted to physically breach the metal barricades that had been set up for the protection of the officers, the building, and those inside.   Baggott himself threw an object towards the officers. When the mob succeeded in breaching the barricades, Baggott was in the vanguard – a mere 30 seconds behind the leaders of the pack -- cheering.  Baggott maintained this proximity as the mob approached the exterior of the Capitol building.   He was present as rioters smashed through windows and broke open doors to gain entry to the building.  Rather than turning back, he pressed on, entering via broken open doors within the first minute of the breach and continuing to the Ohio Clock Corridor, where he was a short hallway and a line of USCP officers away from the main entrance to the Senate.   Baggott spent more than 40 minutes inside the Capitol building before grabbing an MPD officer's baton as he and other rioters were removed from the building.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.   The History and Characteristics of Baggott

As set forth in the PSR, Baggott has no criminal history and is the owner of this own business.  He has been compliant with the conditions of his pre-trial release.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[16] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[16] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Unlike many January 6 defendants, the government is not aware of any social media posts (or other statements) by Baggott regarding his actions that day. Nevertheless, it is clear that, when faced with a political outcome with which he disagreed, Baggott chose to go beyond discourse or protest. Amid a violent and destructive mob, he excitedly traveled with the leaders of the pack into the Capitol building and into the Ohio Clock Corridor, stayed in the building for more than 40 minutes, and physically engaged with a police officer as he was being removed from the building. Such conduct demonstrates a disregard for legal authority.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[17] This Court must sentence Baggott based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Baggott convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[18] *See United States v. Anna*

---

[17] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table indicates that very few Capitol breach defendants have been sentenced for violations of 18 U.S.C. § 1752(a)(2).

[18]   Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track"

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PLF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Baggott has pleaded guilty to Count Two of the Information, charging him with Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

---

program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

No previously sentenced case contains the same balance of aggravating and mitigating factors present here.   Indeed, very few Capitol breach defendants have been sentenced for violations of 18 U.S.C. § 1752(a)(2).  Of the three that the government has identified[19] – Felipe Marquez (21 Cr. 136 (RC)), Philip Bromley (21 Cr. 250 (PLF), and Dennis Sidorski (21 Cr. 48 (ABJ)) – two, Bromley and Sidorski, were sentenced using U.S.S.G. § 2A2.4 to calculate their base offense level.[20]

---

[19] A fourth defendant, Greg Rubenacker (21 Cr. 143 (BAH)), also pled guilty to a violation of § 1752(a)(2).  However, because Rubenacker pled guilty to additional offenses, including felonies, his Guidelines range and ultimate sentence were more directly derived from those other convictions.

[20] The plea agreement in the Marquez case included a stipulation that U.S.S.G. § 2B2.3, and its Base Offense Level 4, was the applicable Chapter Guideline. That was an error, which the government admitted in its sentencing memorandum in that case. *United States v. Marquez,* 21 Cr. 36 (RC), ECF No. 28 (Government Sentencing Submission), at p. 18, n.6 (noting that "[b]ecause the government agreed in the plea agreement that U.S.S.G. § 2B2.3 is the applicable Guideline here, we do not object to its use in this case. Upon further review of the applicable law and principles, however, the government has concluded that U.S.S.G. § 2A2.4 is the appropriate Guideline for a violation of 18 U.S.C. § 1752(a)(2).")

26

As discussed below, the defendants in those cases received sentences significantly below what the government is recommending here. But what the government is recommending here is a sentence squarely within a Guidelines range that the defendant has stipulated applies in this case. "The best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021) (quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009)).  This is because "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Generally, when a district court "correctly calculated and carefully reviewed the Guidelines range, [the district court] necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007); "Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). The Seventh Circuit has stated that "[c]hallenging a within-range sentence as disparate is a 'pointless' exercise." *United States v. Chapman*, 694 F.3d 908, 916 (7th Cir. 2012) (per curiam). That other January 6 defendants sentenced for violating 18 U.S.C. § 1752(a)(2)—which requires that, "with intent to impede or disrupt the orderly conduct of Government business or official functions, [the defendant] engage[d] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impede[ed] or disrupt[ed] the orderly conduct of Government business or official functions—received sentences below what the government is recommending here cannot mean that imposition of the government's recommended sentence will create an unwarranted disparity.

As for those other § 1752(a)(2) January 6 cases, Bromley and his cousin were amongst the first rioters to attempt to breach the east side of the Capitol building.  There, they joined a crowd

that was chanting at the USCP officers guarding the doors, squeezing and crowding the officers, and eventually assaulting the officers in an attempt to get them to move from the doorway. Although Bromley was largely an observer of the more aggressive and violent conduct of his cousin on January 6 (and at times interceded to prevent him from engaging in further violent conduct), he supplied his cousin with a metal tool that the cousin (unsuccessfully) used in an attempt to breach the doors. Once another rioter opened the doors from the inside, Bromley was one of the first through and subsequently entered the Speaker's Lobby, where he witnessed the fatal shooting of Ashli Babbitt. In total, Bromley spent approximately nine minutes inside the Capitol building, and a much longer period of time on the Capitol grounds. *United States v. Bromley*, 21 Cr. 250 (PLF), ECF No. 42 (Government Sentencing Submission) at 5-11. Bromley had also texted with others regarding his expectations of violence prior to January 6 and, in the day that followed the Capitol breach, texted others asking them not to disseminate what he had told them about January 6. *Id.* at 4, 15-16, 23. In that case, the Government recommended a sentence at the top end of Bromley's Guidelines range;[21] Judge Friedman imposed a sentence of three months' imprisonment.

Sidorski was amongst the crowd on the West Plaza of the Capitol building as other rioters attacked police officers and yelled things such as "Traitors" and "Fuck You!" At one point, while another rioter was skirmishing with a police officer, Sidorski reached out and put his hand on the officer's arm and shoulder. Sidorski then scaled a wall to reach the Northwest steps, entered the Capitol building via the breached Senate Wing Doors (less than a minute after Baggott and Parks

---

[21] The Guidelines range specified in Bromley's plea agreement was 0-6 months' incarceration. However, after the Government determined that Bromley had not been truthful in his debrief with the FBI, the Probation Office applied a two-point enhancement pursuant to U.S.S.G. § 3C1.1, resulting in a Guidelines range of 6-12 months' incarceration.

did so), and spent a significant period of time (37 minutes) inside various areas of the Capitol building, including the Rotunda, the Crypt, Statutory Hall, and a suite of offices used by Nancy Pelosi, the Speaker of the House of Representatives, a particularly sensitive area. *United States v. Sidorski*, 21 Cr. 48 (ABJ), ECF No. 41 (Government Sentencing Submission) at 11-18. Prior to January 6, 2021, Sidorski had also endorsed a comment on Parler urging people to march to the Capitol building and "drag him out by the hair of their heads and boot their butts back home." *Id.* at 10. In the days following January 6, 2021, after seeing himself on the news, Sidorski deleted his Facebook account and threw away the distinctive sweatshirt he wore on January 6. *Id.* at 18. In that case, the Government recommended a sentence of 12 months imprisonment;[22] Judge Berman Jackson imposed a sentence of 100 days' imprisonment.

Marquez traveled to Washington, D.C. with a firearm in the trunk of his car (although the government did not have evidence that he removed it while in Washington, D.C. or brought it with him to the Capitol). At the Capitol, Marquez filmed other rioters climbing walls and encouraged them. He entered the Capitol building, making his way to the front of a large mob, via the Senate Wing Doors, approximately 35 minutes after they had been initially breached. While inside the building, he attempted to "fist bump" police officers, tapping one on the arm to get his attention. Marquez, along with other rioters, entered Senator Jeff Merkley's office, where they smoked and banged on the table. In the approximately one hour that Marquez spent in the Capitol building, he also entered locations such as the Crypt. In the days following January 6, Marquez recorded a parody song regarding rioters' breach of the Capitol, which be posted to YouTube. In that case,

---

[22] The Guidelines calculation specified in Sidorski's plea agreement included a two-point enhancement pursuant to U.S.S.G. § 3C1.1, resulting in a Guidelines range of 12-18 months' incarceration, with at 12-month statutory maximum sentence.

the Government recommended a sentence of four month's incarceration;[23] Judge Contreras imposed a sentence of three months' home incarceration, explaining that Marquez's documented mental-health issues had a "significant influence" on his sentence, and he believed that probation would best allow Marquez to receive mental-health treatment.  *Marquez,* 21 Cr. 135 (RC), Tr. 12/10/21 at 32, 34, 37.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to a term of incarceration at middle of the Guidelines range, followed by one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes

---

[23] The Guidelines range specified in Marquez's plea agreement was 0-6 months' incarceration, using U.S.S.G. § 2B2.3 to calculate his base offense level.

respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Benet J. Kearney*
Assistant United States Attorney
N.Y. Bar No. 4774048
1 Saint Andrew's Plaza
New York, New York 10007
(212) 637 2260
Benet.Kearney@usdoj.gov

## CERTIFICATE OF SERVICE

On this 29th day of July, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ *Benet J. Kearney*
Assistant United States Attorney